**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CIVIL ACTION NO. 1:10-CV-23830-ALTONAGA/BROWN**

**MARCUS D. MIMS,**

        **Plaintiff,**

**-v-**

**GLOBAL CREDIT & COLLECTION**
**CORPORATION,**

        **Defendant.**

_____/

**GLOBAL CREDIT & COLLECTION CORPORATION'S RENEWED MOTION TO**
**COMPEL ARBITRATION AND SUPPORTING MEMORANDUM OF LAW**

      **COMES NOW** defendant Global Credit & Collection Corporation ("Defendant" or "Global"), by and through its undersigned counsel, and respectfully requests that this Court enter an Order compelling arbitration of the plaintiff Marcus D. Mims' ("Plaintiff" or "Mims") individual claims against Global and staying all proceedings against Global during the pendency of the arbitration proceedings. Global relies upon the pleadings and filings in this case, and the depositions, exhibits, and evidence filed with this motion, and states as follows:

### I.  BACKGROUND

      Plaintiff Marcus D. Mims ("Mims") entered into a revolving credit agreement with Capital One Bank (U.S.A.), N.A. ("Capital One"), Account No. XXXX XXXX XXXX 8337 (the "Account").[1] *See* Declaration of Diana T. Muse, attached hereto as Ex. "A" ¶ 2 and exs. thereto.

---

[1] Global has made informal attempts to obtain additional account information relating to Mims' account from Capital One, but has been unsuccessful. Not wanting to invoke the litigation process and risk waiver of its right to compel arbitration, Global has not engaged in any further formal discovery on this issue.  To the extent Plaintiff disputes that Capital One Account No. XXXX XXXX XXXX 8337 is his account or that he agreed to the terms in Customer Agreement attached to the Muse Declaration, Global requests that it be granted leave to conduct arbitration-

In 2009, Capital One sold and assigned Mims' Account to Equable Ascent Financial, LLC f/k/a Hilco Receivables, LLC ("EAF").  *See* Muse Decl., ¶¶ 1-2; Declaration of Greg Neely, attached hereto as Ex. "B," ¶ 6; Bill of Sale, attached hereto as Ex. "C."[2]  Thereafter, EAF retained Global to collect the unpaid balance on the Account on EAF's behalf, pursuant to the Collection Services Agreement ("CSA") between the parties.  *See* Neely Decl., ¶ 8; Declaration of Daniele Depaolis, attached hereto as Ex. "D," ¶¶ 6-7 and Ex. 1 thereto.[3]  This is the only account Global has ever attempted to collect from Mims on.  *See id.*, ¶ 8.

At the time Mims' Account was assigned to EAF, Mim's Card Member Agreement (the "Contract") contained an Arbitration Provision (the "Arbitration Agreement") that required Mims to submit any "claim, controversy or dispute or any kind or nature between" Mims and "us" to arbitration.  *See* Muse Decl., Exs. thereto.  The Arbitration Agreement further notes that any claim that arises from or relates to "any billing or collections matters relating to [Mims] account" must be submitted to binding arbitration, at the election of either party.  *Id.*  The Contract defines "us" as "Capital One Bank and its successors, assigns, agents and/or

---

related discovery of Plaintiff and Capital One limited to solely to these two issues and also that Global be allowed to supplement its Motion to Compel Arbitration with the evidence obtained from said discovery.  Global expects said discovery will demonstrate that Mims opened the Account on February 15, 2005, made his last payment on June 11, 2007 and that he charged at least $1,642.72 on the Account.  *See* Bill of Sale, attached hereto as Ex. C.

[2] Global has made informal attempts to obtain an authenticated copy of the Bill of Sale relating to the sale of Mims' Account to EAF, but has not been able to do so.  Global expects to receive an authenticated copy of said documents by June 24, 2011, at which time it will file them with the Court and move to offer them as supplemental evidence to this motion.

[3] The CSA contains confidential information that EAF has not agreed to allow Global to disclose absent a protective order.  Plaintiff has not agreed to the entry of a protective order.  As such, Global has moved for a protective order and will produce the CSA should a protective order be entered and also move to file a copy of the CSA under seal as supplemental evidence in support of this motion.

**authorized representatives**." *Id.* (emphasis added).  Moreover, under the terms of the Contract, an "assignee . . . take[s] [Capital One's] place . . . ." *Id.*

## II. ARGUMENT

### A.     ARBITRATION AGREEMENTS ARE PRESUMPTIVELY VALID.

The Federal Arbitration Act ("FAA") establishes that an arbitration agreement "shall be valid, irrevocable, and enforceable."  9 U.S.C. § 2.  Congress enacted the FAA to overcome long-standing judicial hostility toward pre-dispute arbitration agreements.  *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 270 (1995).  Congress has also placed arbitration agreements "upon the same footing as other contracts."  *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 225-26 (1987) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974)).

"[G]eneralized attacks on arbitration," *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 30 (1991), based on the "suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants," *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 481 (1989), have been repudiated as "far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes."  *Id.* at 481.  Instead, Congress and the Supreme Court have together created a strong federal policy favoring the enforcement of arbitration agreements.  *See AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745 (2011)  Indeed, these policies are so strong that any doubts concerning arbitrable issues should be resolved in favor of arbitration.  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).  It is against this strong federal policy of encouraging arbitration that this Court must evaluate Global's motion.

**B.**      **THE PREREQUISITES FOR ENFORCEMENT ARE SATISFIED.**

An arbitration agreement is specifically enforceable under the FAA[4] if the following requirements are met: (1) the existence of a written agreement to arbitrate claims, (2) a nexus to interstate commerce, and (3) coverage of the claims by the arbitration clause.   9 U.S.C. § 2. Each of these elements is clearly satisfied in this case.

**1.**      **The Parties' Agreement to Arbitrate is in Writing.**

Mims' Contract contains a written agreement to arbitrate his claims with Global. *See* Muse Decl., ¶ 1-2, exs. thereto.   Mims' Account is governed by the Arbitration Agreement. *Id.* In its subpoena to Capital One, Global demanded sworn testimony regarding the customer agreement governing Capital One's extension of credit to Mims.   The subpoena requested:   "A complete copy of the Card Member Agreement for Marcus D. Mims, Account Number:   XXXX XXXX XXXX 8337, in effect at the time said account was sold to Equable Ascent Financial, LLC f/k/a Hilco Receivables, LLC."   In response, Capital One's representative, swore that the Contract, together with the Arbitration Agreement contained therein, was the agreement Mims agreed to be bound by.   *See* Muse Decl.   Thereafter, Capital One assigned the Account to EAF, and EAF retained Global to settle the Mims' Account. *See* Neely Decl., ¶ 6-8.   Under these circumstances, the Arbitration Agreement may be enforced by Global as a third party beneficiary under the plain language of the Contract and under the doctrine of equitable estoppel.

**a.**      **Global is a third party beneficiary.**

Under the plain language of the Contract, Mims agreed to arbitrate any claims against assigns, such as EAF, and authorized representatives of assigns, such as Global. *See* Muse Decl., exs. thereto.   Although not a signatory, Global can enforce the Arbitration Agreement because

---

[4] Global's motion to compel arbitration is being brought pursuant to the FAA, which Mims acknowledges applies to and governs the Contract. *See* Muse Decl., exs. thereto.

"the signatories agreed to confer the benefits of the contract" on Global as "a third party." *Nexsun Corp. v. Condo*, 2010 WL 2103039, at *2 (M.D. Fla. May 25, 2010).  "[W]hen the parties to a contract together agree, upon formation of their agreement, to confer certain benefits thereunder upon a third party, affording that third party certain rights of action under the contract" the third party can enforce the contract.  *Zisman v. Leshner*, No. 608-CV-1448ORL31DAB, 2008 WL 4459029, *3 (M.D. Fla. Sept. 29, 2008)(citing *MS Dealer Serv.*, 177 F.3d at 947).  "Under Florida law, the question of whether a contract was intended for the benefit of a third party is generally regarded as one of contract construction." *Florida Farm Bureau Ins. Companies v. Pulte Home Corp.*, No. 8:04-CV-2357-T-EAJ, 2005 WL 1345779, at *4 (M.D. Fla. June 6, 2005) (citing *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 983 (11th Cir. 2005)).  Therefore, "[t]o determine whether a party is a third party beneficiary to a contract, a court must review the terms of the contract as a whole."  *Id.*  More specifically, "[t]he court should focus on whether the contracting parties intended that a third party should receive a direct and substantial benefit which might be enforced by the court." *Id.*[5]

### i.    *EAF stepped into the shoes of Capital One.*

The Contract provides that "[t]he **assignee** will take **our** place under this Agreement ...." Muse Decl., exs. thereto (emphasis added).  Moreover, the "words 'we,' 'us' and 'our' mean Capital One Bank and its … **authorized representatives**" under the Contract.  *Id.*  Thus, when Capital One assigned Mim's Account to EAF, EAF took Capital One's place within the definition of "we," "us," and "our."  Consequently, since EAF stepped into Capital One's shoes, the "words 'we,' 'us' and 'our' mean [EAF] and its … authorized representatives." *Id.*

---

[5] The Contract states that it is governed by Virginia law.  However, Virginia follows the same standard.  *See Ward v. Ernst & Young*, 435 S.E.2d 628, 634 (Va. 1993).

### ii.       Global is an authorized representative of EAF.

Global fits within the definition of "we," "us," and "our" as EAF's "authorized representative."  The fact that EAF and Global fall within the definition of "us" is significant because the Arbitration Agreement specifically states that it applies to all claims between Mims and "**us**."  In *Hoefs v. CACV of Colorado, LLC*, 365 F. Supp. 2d 69 (D. Mass. 2005), the Court examined the minutia of a MBNA America Bank, N.A. agreement with similar language.  The agreement stated: "'we' and 'us' means MBNA America Bank, N.A., its parent, subsidiaries, affiliates, licensees, predecessors, successors, assigns, and any purchaser of your account, and all of their officers, directors, employees, agents, and assigns or any and all of them."  In that case, MBNA sold the account to a lender who then hired a debt collector to collect the unpaid balance.  The Court found that the new lender was an "assign" under the agreement, and that its debt collector was an "agent" under the agreement and ordered arbitration.  *See id.* at 74-75.

Similarly, in the Contract at issue here, "agents," and even broader, "authorized representatives," are specifically included in the definition of "us," and the Arbitration Agreement covers all claims between Mims and "us."  Additionally, Global was operating as the authorized representative of the assignee of the original lender and, consequently, was an intended beneficiary of the Contract.  Based on the reasoning of *Hoefs* and the plain language of the Contract, a writing exists that binds Mims to arbitrate his claims against Global.

This exact language regarding "authorized representatives" was also recently interpreted recently by the District Court for the Northern District of Ohio.  In *Hodson v. Javitch, Block & Rathbone, LLP*, 531 F. Supp. 2d 827 (N.D. Ohio 2008), a law firm was hired by Capital One to collect debts **on its behalf**.  The plaintiff brought suit against the debt collector for violations of the FDCPA, and the debt collector moved to compel arbitration.  In ruling for the debt collector, the court stated:

> First, the arbitration clause in the cardholder agreements states that "authorized representatives" of Capital One can request binding arbitration. As the law firm Capital One hired to pursue collections actions under the cardholder agreements [the plaintiff] signed with Capital One, [the debt collector] is within the ordinary meaning of "authorized representative." [The plaintiff] therefore agreed to arbitrate disputes within the scope of the arbitration clause with [the debt collector] as well as with Capital One.

*Hodson*, 531 F. Supp. 2d at 831.

In this case, Global is not just a random entity unrelated to any party, it was retained by EAF to settle Mims' Account. As the *Hodson* court stated, this "is within the ordinary meaning of 'authorized representative.'" Black's Law Dictionary defines "authority" as "[t]he right or permission to act legally on another's behalf" and "representative" as "[o]ne who stands for or acts on behalf of another." Black's Law Dictionary (9th ed. 2009). Thus, an authorized representative is one who has been given permission to act legally on behalf of another. *See Colson Services Corp. v. Insurance Co. of North America*, 874 F.Supp. 65, 68 (S.D.NY 1994); *Hill v. James*, 175 So. 2d 176, 179 (Miss. 1965); *Bunker Hill Co. Lead and Zinc Smelter v. U.S. Environmental Protection Agency*, 658 F.2d 1280 (9th Cir. 1981). Global fits squarely within this definition. *See* Neely Decl. at ¶¶ 7-8.

Further, the CSA between EAF and Global removes any question regarding whether Global was an authorized representative of EAF. *See* DePaolis Decl. at Ex. 1 thereto. Mims' Account was a Secondary Placed Account under the CSA. *Id* at ¶ 7. Therefore, the CSA states that Global had "**blanket authorization**" from EAF to settle Mims account for an amount less than 100 cents on the dollar. *Id.*, Ex. 1 thereto, p. 25. Therefore, under the terms of the CSA, if Global negotiated with Mims and accepted a payment from Mims for this authorized amount, EAF would be bound by the settlement. This further illustrates the point that Global was acting under a specific grant of authority from EAF to settle Mims' Account.

Relying on *Lucy v. Bay Area Credit Serv LLC*, CIV.A. 3:10-CV-1024, 2011 WL 2006358 (D. Conn. May 23, 2011), Mims may attempt to make much of the fact that the CSA contains the conclusory statement that it does not authorize Global to act as the agent or legal representative of Equable.  However, this Court must look past labels designated by the parties to the true nature of the parties' relationship.  *See, e.g., SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1339 (11th Cir. 2010); *Wolicki-Gables v. Arrow Int'l, Inc.*, 641 F. Supp. 2d 1270, 1289 (M.D. Fla. 2009), *aff'd*, 634 F.3d 1296 (11th Cir. 2011).  In light of this fact, Middle District of Florida recently noted "that the use of descriptive labels in a contract is not determinative of the actual legal relationship of the parties. The status of the parties depends upon the language of the contract and all the circumstances in their dealing with each other." *Wolicki-Gables*, 641 F. Supp. 2d at 1289 (internal citations omitted).

In this case, the CSA states that Global is not EAF's agent or legal representative. *See* DePaolis Decl. at Ex. 1 thereto, p. 15.  However, it is indisputable that, under the terms of the CSA, Global was, in fact, given blanket authorization from EAF to settle Mims' account for less than 100 cents on the dollar.  *Id.* at ¶ 7 and Ex. 1 thereto, p. 25.

Moreover, the term "legal representative" has a very narrow meaning that does not encompass authorized representatives.  Under Illinois law, which governs interpretation of the phrase "legal representative" under the terms of the CSA, the term "legal representatives" is commonly used to mean "executors and administrators," or "next-of-kin." *Delaunay v. Burnett*, 9 Ill. 454, 493 (Ill. 1847); *see also* DePaolis Decl. at Ex. 1 thereto.  However, it can also be slightly broader that includes any successor in interest, such as a purchaser or assignee.  *See Delaunay*, 9 Ill. at 496-97.  Similarly, the U.S. Supreme Court has indicated that the term "legal representative"  "embrace[s] representatives of the original grantee … by contract, such as

assignees or grantees, as well as by operation of law ...." *Hogan v. Page*, 69 U.S. 605, 607 (1864).  Stated differently, "[t]he term 'legal representatives' is not necessarily restricted to the personal representatives of one deceased, but is sufficiently broad to cover all persons who, with respect to his property, stand in his place and represent his interest, whether transferred to them by his act or by operation of law." *Mut. Life Ins. Co. v. Armstrong*, 117 U.S. 591, 594, 6 S. Ct. 877, 879 (1886); *Murphy v. Peterson*,  473 N.E.2d 480, 483-84 (Ill. App. Ct. 1984) (noting that "agents" are not even included in the definition of "legal representative").  "A number of other cases might be cited wherein the courts have held that a 'legal representative' may mean any person or corporation taking the beneficial interest in property, real or personal, and includes all persons who stand in place or represent the interests of another either by his act during the lifetime of the assignor or by operation of law after his death." *Clear Water Timber Company*, 44 Pub. Lands Dec. 516 (D.O.I. 1916), 1916 WL 1156; s*ee also Peterson v. Ballard*, 679 A.2d 657, 661-62 (N.J. Super. Ct. App. Div. 1996).[6]

Furthermore, this understanding of "legal representative" as a "successor in interest" is consistent with the other provisions of the CSA; conversely, a broad interpretation of "legal representative" would conflict with the other provisions.  *See Sims v. Clarendon Nat. Ins. Co.*, 336 F. Supp. 2d 1311, 1319 (S.D. Fla. 2004)((internal quotation marks omitted)); *see also Archer-Daniels-Midland Co. v. Phoenix Assur. Co. of New York*, 936 F. Supp. 534, 538 (S.D. Ill. 1996).  If the exclusion of "legal representatives" was so broad that it prohibited Global from being an "authorized representative" to settle Mims' Account for EAF, Global could not fulfill its duties under there remaining provisions of the CSA, and that one exclusion would, in effect, gut

---

[6] Black's Law Dictionary is even more strict.  Under Black's, a "legal representative" is only a legal heir or an executor, administrator, or other personal representative "who manages the legal affairs of another because of incapacity or death."  Black's Law Dictionary (9th ed. 2009).

the remainder of the agreement.  Therefore, even if the Court relied on the exclusionary "labels" contained in the CSA, Global would still qualify as an "authorized representative" of EAF.

Returning to *Lucy*, it should also be noted that the arbitration agreement in *Lucy* **did not cover "authorized representatives"**.  In other words, Mims' Contract is broader than the one in *Lucy*.  Consequently, this case is on an entirely different footing than *Lucy*.  Accordingly, Global can enforce the Arbitration Agreement as a third party beneficiary of the Contract.

### b.      Equitable estoppel bars Mims from avoiding arbitration.

Mims' claims be also arbitrated under the doctrine of equitable estoppel.  Equitable estoppel applies if:

> the signatory to a written agreement containing an arbitration clause "must rely on the terms of the written agreement in asserting [its] claims" against the nonsignatory. When each of a signatory's claims against a nonsignatory "makes reference to" or "presumes the existence of" the written agreement, the signatory's claims "arise[ ] out of and relate[ ] directly to the [written] agreement," and arbitration is appropriate.

*MS Dealer Serv.*, 177 F.3d at 947 (internal citations omitted).   In this case, Mims' claims "presumes the existence of" an underlying credit agreement.  In his Complaint, Plaintiff asserts claims against Global for alleged violations of the FDCPA based on Global's attempt to collect the debt owing on the Account.  *See generally*, Complaint.  Specifically, Mims' claims are based on the allegation that Global contacted Mims as a debt collector for the purpose of collecting a debt, without disclosing these facts to Mims.  *See* Complaint, ¶ 12.  Such claims and require Plaintiff to prove, among other things, that he is a "consumer" and that there is an underlying "debt" as defined by the FDPCA.  *See* 15 USC 1692a(3)  a(5) & e(11).

The Southern District of Florida recently addressed the issue of when claims arise out of a written agreement, explaining that "[a] claim 'arises out of' a contract when it is related with at least some directness to performance of duties specified by the contract."  *Bolanos v. First*

*Investors Servicing Corp.*, 10-23365-CIV, 2010 WL 4457347, at *2 (S.D. Fla. Oct. 29, 2010).  In

*Bolanos*, the plaintiff brought FDCPA and FCCPA claims against the assignee of his lender

based on its debt collection practices.  The Court explained,

> Here, there is no question that [the plaintiff's] claims relate fairly directly to
> performance of contractual duties. Under the original financing contract, [the
> plaintiff] had a duty to pay off its note to [the lender], and his claims relate to the
> actions of [the new note holder], [the lender's] assignee, in collecting that debt.
> Moreover, [the plaintiff] could not even maintain this action without reference to
> the financing contract because the contract is necessary to show that [the plaintiff]
> is a "consumer" and that the underlying "debt" exists -- **two prerequisites to
> filing suit under the FDCPA and FCCPA**.

*Id.*

Significantly, the same reasoning applies to Mims' claims.  Mims' claims are against

Global as a debt collector and he "could not even maintain this action without reference to the

[Contract] because the contract is necessary to show that [Plaintiff] is a 'consumer' and that the

underlying 'debt' exists -- two prerequisites to filing suit under the FDCPA." *Bolanos*, 2010 WL

4457347, at *2.  Thus, the existence of a written agreement to arbitrate requirement is satisfied

by the doctrine of equitable estoppel.

The Eastern District of Wisconsin also addressed this issue in *Tickanen v. Harris &*

*Harris, Ltd.*, 461 F. Supp. 2d 863 (E.D. Wis. 2006).  In that case, the plaintiffs alleged that the

defendant debt collector sent out debt-collection letters with the wrong creditor listed in violation

of the FDCPA: one creditor was listed when, in fact, another creditor owned the debt and the

defendant was working as the new creditor's debt collector.  By doing so, the Court determined

that the "plaintiffs are acknowledging the existence of a debt, which was assigned to [the new

creditor]. Plaintiffs cannot acknowledge the debt and ignore the concomitant arbitration

agreement. Plaintiffs are 'presuming the existence of the written agreement[.]" *Tickanen*, 461 F.

Supp. 2d at 870.  *See also Wilder v. Midland Credit Mgmt.*, No. CIVA109CV2039JOFAJB,

2010 WL 2499701, at *4 (N.D. Ga. May 20, 2010) (finding that the defendant's debt-collection activities, which the plaintiff claimed were in violation of the FDCPA, related to or arose from the credit agreement), *report and recommendation adopted*, No. CIVA109CV02039JOFAJB, 2010 WL 2499659 (N.D. Ga. June 15, 2010).

As the *Tickanen* Court made clear, a plaintiff cannot pick and choose which parts of an agreement he wants to acknowledge.  By suing based on Global's debt collection activities arising from the subject debt, Mims presumed the existence of the credit agreement giving rise to the debt.  Therefore, Mims "cannot acknowledge the debt and ignore the concomitant arbitration agreement."  *Tickanen*, 461 F. Supp. 2d at 870.  Consequently, the Arbitration Agreement contained in the Contract is binding on Mims and can be enforced by Global.

## 2.      **The Contract Involves or Affects Interstate Commerce.**

The Contract affects interstate commerce.  The delivery, transfer, or movement of goods, services, or other articles of commerce "across state lines … has long been recognized as a form of 'commerce.'  *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 573 (1997).  This is especially true when it is money that is being delivered, transferred or moved across state lines.  *See, e.g., United States v. Owens*, 159 F.3d 221, 226 (6th Cir. 1998).  Thus, courts have consistently held that the FAA applies to loan agreements where the "money-raising activity took place in another state."  *Mesa Operating Ltd. P'ship v. Louisiana Intrastate Gas Corp.*, 797 F.2d 238, 243 (5th Cir. 1986).

Here, interstate commerce is unquestionably "affected" by the Contract.  Mims admits in the Complaint that he is a resident of Florida and the Contract also provides that it is governed by Virginia law.  *See* Complaint, ¶ 1; *see also* Muse Decl., exs. thereto.  Mims also entered into the Contract with Capital One, a national banking association and the Contract requires

communications to be sent outside Florida.  *See* Muse Decl., exs. thereto.  Thus, the second prerequisite for the enforcement of the arbitration provision is satisfied.

It is also evident that the Contract affected interstate commerce because it was extensively regulated by the federal government by virtue of its plenary powers under the Commerce Clause.  For example, credit agreements such as the one at issue must comply with several federal laws and regulations, including the federal Truth-in-Lending Act and the FTC "holder in due course" rule, both of which have as their genesis the Commerce Clause.[7]  Since "[t]he financing transaction, itself, must comply with federal laws and regulations including the Truth-in-Lending Act … a nexus exists between the arbitration agreement in this case and interstate commerce."  *First Family Fin. Serv., Inc. v. Fairley*, 173 F. Supp. 2d 565, 573 (S.D. Miss. 2001).  Because of the undisputed federal regulation of the Mims' Contract, it necessarily follows that it "affects" interstate commerce so as to bring into play the FAA.

Finally, when a contract expressly provides that the transaction involves interstate commerce within the meaning of the FAA, a court **will and must enforce the stipulation and apply the FAA to the arbitration agreement contained in the contract**.  *See Staples v. The Money Tree, Inc.*, 936 F. Supp. 856, 858 (M.D. Ala. 1996) (emphasis added).  Here, the parties expressly agreed that "[t]his Arbitration Provision is made pursuant to a transaction involving interstate commerce and shall be governed by and enforceable under the Federal Arbitration Act (the 'FAA')."  Muse Decl., exs. thereto.  Accordingly, there is no doubt that Mims' agreement involved interstate commerce and the second prerequisite to enforcement is met.

---

[7] *See Mourning v. Family Publ'n Serv.*, 411 U.S. 356, 377 (1973); *see also FTC v. P. Lorillard Co.*, 283 F. 999, 1002-03 (S.D.N.Y. 1922), *aff'd*, 264 U.S. 298 (1924).

3.      **The Claims In This Action Are Covered by the Agreement.**

The Arbitration Agreement is unquestionably broad enough in scope to encompass the claims in this action.  When determining the scope of an arbitration provision, the Court must look to the factual allegations of the complaint and determine whether the claims alleged therein touch and concern matters covered by the arbitration provisions. *See Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 846 (2nd Cir. 1987); *In re Tirex Int'l, Inc.*, 395 B.R. 182, 194 (Bankr. S.D. Fla. 2008).  Additionally, "due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." *Volt Info. Sci., Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 476 (1989). Finally, the presumption of arbitrability, created by the mere existence of an arbitration clause, can be overcome only if "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage."  *AT&T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650 (1986).

The arbitration provision includes the following claims within its scope:

"**Claim**" means any claim, controversy or dispute of any kind or nature between you and us.
A. ***This definition includes, without limitation, any Claim that in any way arises from or relates to:***
• the Agreement and any of its terms (including any prior agreements between you and us or between you and any other entity from which we acquired your account)
• this Arbitration Provision (including whether any Claim is subject to arbitration)
• the establishment, operation or termination of your account
• any disclosures, advertisements, promotions **or other communications relating to your account**, whether they occurred before or after your account was opened
• any transactions or attempted transactions involving your account
• **any billing or collections matters relating to your account**
• any posting of transactions (including payments or credits) to your account
• any goods or services charged to your account
• any fees, interest or other charges assessed to your account, or their calculation

- any products, services or benefits programs related to or offered in connection with your account (including any insurance, debt cancellation or extended service contracts and any programs, rebates, rewards, sweepstakes, memberships, discounts or coupons) whether or not we offered, introduced, sold or provided them
- our receipt, use or disclosure of any information about you or your account
- any other matters relating to your account or your relationship with us.

B. ***This definition also includes, without limitation, any Claim:***

- regardless of how or when it is brought (for example, as an initial claim, counterclaim, cross-claim, interpleading or third-party claim)
- based on any theory of relief or damages (including money damages and any form of specific performance or injunctive, declaratory or other equitable relief)
- based on any theory of law or equity (including contract, tort, fraud, constitution, statute, regulation, ordinance or wrongful acts or omissions of any type, whether negligent, reckless or intentional)
- made by you or by anyone connected with you or claiming through or for you (including a co-applicant or authorized user of your account, your agent, your representative, your heirs or a trustee in bankruptcy)
- for which we may be directly or indirectly liable under any theory, including respondeat superior or agency (even if we are not properly named at the time the Claim is made)
- now in existence or that may arise in the future, regardless of when the facts and circumstances that give rise to the Claim occurred or when the Claim accrued
- made as part of a class action, private attorney general action, or other representative or collective action which Claim shall proceed on an individual basis as set forth more fully in this Arbitration Provision.

Muse Decl., exs. thereto (emphasis added). The claims of Mims based on Global's alleged improper collection activity fall squarely within the broad scope of the Arbitration Agreement. Therefore, Mims cannot show "with positive assurance that the arbitration [provision] is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs.*, 475 U.S. at 650. Accordingly, all of Mims' claims against Global are subject to arbitration.

It also bears noting that Mims agreed that all issues relating to the arbitrability of his claims should be decided by the arbitrator. Specifically, the arbitration provision provides that:

**Arbitration Administrators.** One of the following arbitration administrators ("Administrator" or, collectively, "Administrators") will administer the arbitration:

JAMS
1920 Main St., Ste. 300

Irvine, CA 92614
www.jamsadr.com

American Arbitration Ass'n
335 Madison Ave., Floor 10
New York, NY 10017-4605
www.adr.org

National Arbitration Forum
P.O. Box 50191
Minneapolis, MN 55405
www.arbitration-forum.com

You may contact any of the Administrators to obtain information about arbitration, arbitration rules and procedures, fee schedules and claim forms.

**Election and Initiation of Arbitration.** You or we may elect arbitration under this Arbitration Provision with respect to any Claim, even if the Claim is part of a lawsuit brought in court. You or we may make a motion or request in court to compel arbitration of any Claim brought as part of any lawsuit. We will not elect or initiate arbitration of any Claim brought in a small claims court (or the equivalent), so long as the Claim remains in that court, is made solely on behalf of an individual or joint account holder and is not made as part of a class action, private attorney general action or other representative or collective action.

Muse Decl., exs. thereto.  Agreements such as these authorize the arbitrator to decide issues of arbitrability based on the governing arbitration rules and have routinely been upheld by state and federal courts under the doctrine announced in *First Options, Inc. v. Kaplan*, 514 U.S. 938 (1995).  There, it is explained that "[j]ust as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, *see, e.g., Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57 (1995); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985), so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about **that** matter."  *Id.* at 943 (emphasis in original); *see also Scott v. Prudential Securities, Inc.*, 141 F.3d 1007, 1011 (11th Cir. 1998). This principle flows inexorably "from the fact that arbitration is simply a matter of contract between the parties."  *First Options, Inc.*, 514 U.S. at 943.  Thus, the Court held that where

parties clearly agree to arbitrate issues of arbitrability, such issues should be reserved for the arbitrator.  *See id.*

Additionally, the law is clear that parties may bar courts from deciding the question of whether a dispute is arbitrable by contracting for an arbitrator to determine arbitrability.  *See First Options, Inc. v. Kaplan*, 514 U.S. 938 (1995).  When parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, such as the arbitral forum's rules, the incorporation serves as clear evidence of the parties' intent to delegate such issues to an arbitrator.  *See Terminix Int'l Co. v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327 (11th Cir. 2005).

The applicable AAA rules provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."  *Am. Arbitration Assn. Commercial Arbitration Rules*, www.adr.org, Rule R-7(a), a true and correct copy of which is attached hereto as Ex. E.  The applicable National Arbitration Forum rules provides that "[a]n Arbitrator shall have the power to rule on all issues, Claims, defenses, and objections relating to the existence, scope, and validity of the contract, transaction, or relationship of the Parties" and "shall have the power to rule on all issues, claims, responses, and objections regarding the existence, scope, and validity of the arbitration agreement including all objections relating to jurisdiction, unconscionability, contract law, and enforceability of the arbitration agreement."  *National Arbitration Forum Code of Procedure*, www.arb-forum.com, Rule 20(E)-(F), a true and correct copy of which is attached hereto as Ex. F.  The applicable JAMS rules provides that "[j]urisdictional and arbitrability disputes, including disputes over the existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator.  The Arbitrator has the authority to determine

jurisdiction and arbitrability issues as a preliminary matter." *JAMS Comprehensive Arbitration Rules and Procedures*, www.jamsadr.com, Rule 11(c), a true and correct copy of which is attached hereto as Ex. G.

In this case, Mims specifically agreed to conduct the arbitration in accordance with the applicable rules of the AAA, National Arbitration Forum, and JAMS.  *See* Muse Decl., exs. thereto.  In so doing, the parties left no doubt whatsoever that the arbitrator alone should have the power to rule on the arbitrability of the claims in this case.  *See Terminix Int'l Co. v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327 (11th Cir. 2005); *see also* AAA Rule R-7(a), National Arbitration Forum Rule 20(E)-(F), JAMS Rule 11(c).  Mims cannot evade the consequences flowing from the incorporation of these rules into his Arbitration Agreement.  Accordingly, all of the prerequisites under the FAA for enforcement of arbitration agreements are satisfied in this case, Global's Motion to Compel Arbitration should be granted, and any issues relating to the arbitrability of claims should be reserved for the arbitrator.

## C.     <u>MIMS WAIVED THE RIGHT TO ASSERT CLASS ACTION CLAIMS.</u>

Under the terms of the Arbitration Agreement, once any party has elected arbitration, no party has "the right to … participate in a class action or any other collective or representative proceeding."  Muse Decl., exs. thereto.  Moreover, under the Arbitration Agreement, the Court, not the arbitrator, has the right to enforce this class action waiver.  *Id.*  Consequently, Mims' claims should be compelled to arbitration as individual, rather than class, claims.

If there was any question as to the enforceability of class action waivers in the context of arbitration, the United States Supreme Court resolved that question affirmatively just a few weeks ago.  In *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (April 27, 2011), the plaintiffs "contending that the arbitration agreement was unconscionable and unlawfully

exculpatory under California law because it disallowed classwide procedures."  131 S. Ct. at 1745.  The United States Supreme Court disagreed.  The Court found that California's general law regarding unconscionability was being applied in such a way as to disproportionately impact on arbitration agreements and frustrated the principal purpose of the FAA, which is "to 'ensur[e] that private arbitration agreements are enforced according to their terms.' "  *Id.* at 1748 (quoting *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)).  According to the Court, "[a]rbitration is a matter of contract, and the FAA requires courts to honor parties' expectations."  *Concepcion*, 131 S. Ct. at 1752.  Based on this reasoning, the Court held that the California unconscionability rule restricting class-action waivers was preempted by the FAA.  In light of *Concepcion*, the class action waiver contained in Mims' Arbitration Agreement must be enforced according to its terms.  Plaintiff must be compelled to proceed on an individual, rather than class, basis.

### D.    PLAINTIFF'S CLAIMS AGAINST GLOBAL ARE DUE TO BE STAYED.

This Court should not only compel the arbitration of Mims' claims against Global, but it should also stay all proceedings in this matter relating to Global pending the conclusion of the arbitration proceedings.   A stay is proper in this action under section 3 of the FAA, which provides for a stay of litigation where issues are referable to arbitration:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, *shall on application of one of the parties stay the trial of the action* until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3 (emphasis added).

In enacting Section 3, Congress deliberately chose not to utilize mere precatory words giving discretion to trial courts in deciding whether a stay should issue.  Instead, the stay provisions found in Section 3 of the FAA are mandatory.  Under the Federal Arbitration Act, "if arbitration is indicated by the contract, then a stay is required by the statute."  *Pearce v. E.F. Hutton Group, Inc.*, 828 F.2d 826, 830 (D.C. Cir. 1987).  For these reasons, if this Court enters an order compelling arbitration, which it should, the Court must stay all proceedings, against Global during the pendency of the arbitration proceedings.

### III.  <u>CONCLUSION</u>

Mims should be compelled to arbitrate all of his claims against Global on an individual basis, and his claims against Global are due to be stayed during the arbitration.

Pursuant to Local Rule 7.1(a)(3)(A), I hereby certify that counsel for Global has made reasonable efforts to confer with all parties who may be affected by the relief sought in this and that Plaintiff opposes this motion.

Dated: June 23, 2011

Respectfully submitted,

s/ R. Frank Springfield
John R. Chiles (FL Bar No. 0012539)
R. Frank Springfield (FL Bar No. 0010871)
Christy Parrish (FL Bar No. 0014404)

BURR & FORMAN LLP
450 S. Orange Avenue, Suite 200
Orlando, Florida 32801
Telephone:  (407) 540-6655
Facsimile: (407) 461-9268
jchiles@burr.com
fspringf@burr.com
cparrish@burr.com

Attorneys for Defendant
GLOBAL CREDIT & COLLECTION CORP.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served a copy of the foregoing document by Notice of Electronic Filing, or, if the party served does not participate in Notice of Electronic Filing, by U.S. First Class Mail, hand delivery, fax or email on June 23, 2011:

Donald A. Yarbrough
Post Office Box 11842
Ft. Lauderdale, FL  33339
(954) 537-2000
(954) 566-2235
donyarbrough@mindspring.com

s/ R. Frank Springfield
OF COUNSEL